## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PIERCE ASSOCIATES, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**ST. PAUL MERCURY INSURANCE CO.,**<br><br>**Defendant.** | **Civil Action No.  04-1906 (JDB)** |

## MEMORANDUM OPINION

Pending before the Court in this insurance-coverage dispute are cross-motions for partial summary judgment.  Resolution of the motions turns on whether the terms of a commercial general liability policy imposed on the insurer, St. Paul Mercury Insurance Co. ("St. Paul"), a duty to continue to defend the interests of an insured, Pierce Associates, Inc. ("Pierce"), in litigation after the insured was dismissed from the suit but where the insured's conduct remained at issue and the insured's surety, Liberty Mutual Insurance Co. ("Liberty"), was still a defendant in the case.  Having reviewed the policy and carefully considered the submissions of the parties and the entire record herein, including the arguments made at the motions hearing on February 10, 2006, the Court concludes, for the reasons that follow, that the language of this particular policy does support the imposition of such a duty on St. Paul.  Accordingly, the Court will grant plaintiff Pierce's motion for partial summary judgment and will further declare that St. Paul is liable to Pierce for breach of the duty to defend under the insurance policy (i.e., St. Paul must reimburse Pierce for the contested defense costs it incurred).

# BACKGROUND[1]

This civil action arises out of the construction of the Ritz-Carlton Hotel and Condominiums at Millennium Square in Washington, D.C. ("the project") -- specifically the work of Pierce, a plumbing and heating, ventilation, and air-conditioning ("HVAC") subcontractor on the project. The developer of the project was 2200 M Street, LLC ("2200 M"), and Bovis Lend/Lease, Inc. ("Bovis"), was the construction manager. On June 15, 1999, Pierce entered into a subcontract with Bovis in which Pierce pledged to indemnify Bovis and 2200 M against "any claim, cost, expense, or liability ... caused by, arising out of, resulting from, or occurring in connection with" the performance of Pierce on the project. J.A. Ex. 1 at ¶ 12.

Pursuant to the subcontract, Pierce was required to secure a performance bond for its work on the project, and it obtained such a bond, in the amount of $16,177,261, from Liberty on July 19, 1999. The bond indemnifies Bovis from "any and all loss, damage, and expense" that Bovis may sustain by Pierce's failure to "truly perform all the undertakings, covenants, terms, conditions, and agreements" of the subcontract. J.A. Ex. 2 at 1. In exchange for Liberty's issuance of the bond and corresponding pledge to serve as Pierce's surety, Pierce agreed to indemnify Liberty

---

[1] Unless otherwise indicated, all of the background facts are taken from the parties' Agreed Statement of Material Facts As To Which There Is No Genuine Issue, which the parties jointly submitted pursuant to L. Civ. R. 56.1 and which the Court will cite herein as "Agreed Stmt." For ease of reference, the Court will use the following citation forms for the parties' briefs on their cross-motions for summary judgment: Pierce's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Pierce Mem."); St. Paul's Memorandum of Points and Authorities in Support of Cross-Motion for Summary Judgment ("St. Paul Mem."); Pierce's Memorandum of Points and Authorities in Opposition to St. Paul's Cross-Motion for Summary Judgment ("Pierce Opp'n"); St. Paul's Opposition to Pierce's Motion for Summary Judgment ("St. Paul Opp'n"); Pierce's Reply Memorandum in Support of Motion for Summary Judgment ("Pierce Reply"); St Paul's Reply Memorandum in Support of Cross-Motion for Summary Judgment ("St. Paul Reply"). The parties also have submitted a Joint Appendix of Evidence consisting of sixteen exhibits, which the Court will cite herein as "J.A. Ex. __."

against any liability related to the bond.  J.A. Ex. 3 at 1.

Pierce also was included as a "protected person" on a commercial general liability insurance policy ("the policy") that was purchased by 2200 M and underwritten by St. Paul.  It provides that "[St. Paul will] pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that: happens while this agreement is in effect; and is caused by an event."  J.A. Ex. 9 at 2-3.  The policy further provides that "[St. Paul will] have the right and duty to defend any protected person against a claim or suit for injury or damage covered by this agreement" and that it will "have such right and duty even if all the allegations of the claim or suit are groundless, false, or fraudulent."  Id. at 4.  The policy, however, excludes from coverage "injury or damage for which the protected person has assumed liability under any contract or agreement," except when "the protected person would have liability [for the injury or damage] without the contract or agreement."  Id. at 12.

Following Pierce's asserted completion of its work on the project, 2200 M and Bovis were sued in a series of lawsuits filed by condominium owners and other tenants of the Millennium Square complex.  The suits alleged defects in the construction of the project, including alleged defects in plumbing and mechanical work, and claimed that the defects caused property damage and bodily injury.  In a November 19, 2002, letter to Pierce, 2200 M made a demand for

> (a) all of the costs and expenses [associated with "responding to claims asserted by owners and tenants at Millennium Square and in correcting defects in the plumbing, HVAC, roofing and waterproofing systems"], (b) additional consequential damages sustained by 2200 M, including lost income attributable to its inability to market units due to the pervasive plumbing and HVAC defects discovered at Millennium Square; (c) all future costs and expenses incurred by 2200 M in connection with the investigation and remediation of plumbing/HVAC defects and property damage caused by associated water leaks at Millennium Square, and (d) any liability imposed on 2200 M for alleged personal injuries.

J.A. Ex. 6 at 2.  Bovis received a similar demand letter from 2200 M and tendered that demand to

Pierce for indemnification in a December 9, 2002, letter.  Bovis likewise demanded that Liberty

"honor its obligations under the Subcontract and Bond ... to protect the interests of [2200 M] and

Bovis by indemnifying [2200 M] and Bovis and by holding [2200 M] and Bovis harmless against

the claims in [2200 M's] Demand."  J.A. Ex. 5 at 1.

Subsequently, 2200 M filed a lawsuit in New York Supreme Court ("the New York

action") that, among other things, asserted claims of negligence, see J.A. Ex. 8 at 24 ("Count II"),

and breach of contract, see id. at 36 ("Count IX"),  against Pierce and alleged that Pierce's conduct

> resulted in leaks and water intrusions in the Project ... [that] in turn caused damage,
> including but not limited to damage to certain common areas, residential units, areas of the
> Ritz-Carlton Hotel, and to other property located in certain common areas and residential
> units, as well as to furnishings in the property, including carpeting, drywall, and other
> furnishings and equipment.

Id. at 24-25.  Count XI of the suit named Liberty as a defendant and alleged that Liberty, as the

surety on Pierce's performance bond, was responsible for Pierce's failure "to perform [its] work on

the Project in a good, workmanlike and timely manner, and in accordance with contract

documents"[2] and that, because of that failure, 2200 M was forced to spend a substantial amount of

money on, among other things, "investigating water intrusion and mold damage at the Project,"

resolving claims by residential unit owners of resulting damage to their property and furnishings,

and "performing necessary repairs to mitigate damages."  See id. at 39.

Pierce provided notice of these claims to St. Paul and requested that St. Paul provide

---

[2] The "Factual Background" section of the complaint in the New York action provides
more detail about the alleged failures by Pierce.  Specifically, 2200 M alleges that Pierce "(1)
failed to adequately tighten plumbing couplings, (2) failed to adequately install piping and
sleeving, (3) failed to adequately install drains, and (4) through other acts and failures caused
damage to the Project."  J.A. Ex. 8 at 14.

defense and indemnity coverage to Pierce and Liberty under the policy.  St. Paul agreed, under a reservation of rights, to defend Pierce against the New York action and with respect to the demands from 2200 M and Bovis, but it refused to pay for any costs incurred by Pierce in defending Liberty against the New York action.  Pierce succeeded in obtaining dismissal from the New York action on personal-jurisdiction grounds, but the claim against Liberty remained until the New York Supreme Court dismissed the entire action on grounds of *forum non conveniens*.  In the interim between Pierce's dismissal from the New York action and the dismissal of the entire action, Pierce spent approximately $240,000 on legal representation for Liberty in the case.[3]

On November 2, 2004, Pierce commenced this action, which, among other things, alleges that St. Paul breached its contractual duty to defend Pierce when it refused to pay the defense costs of Liberty in the New York action.  The parties have filed cross-motions for partial summary judgment on the issue of St. Paul's liability to Pierce, and the Court held a hearing on the motions on February 10, 2006.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where, as here, the parties have filed cross-motions for summary judgment and neither party has contested the other's assertion that there is an absence of any genuine issue of material fact, <u>see</u> Agreed Stmt., the Court's inquiry is limited to whether

---

[3] Pierce does not seek recovery of any of the expenses relating to the defense it provided for Liberty during the period when Pierce also was a defendant in the New York action because the need for separate counsel for Liberty resulted from a conflict of interest at the law firm representing Pierce.

either party is entitled to judgment as a matter of law based on the undisputed material facts.

Under New York law,[4] a court may render judgment as a matter of law in a case involving interpretation of an insurance contract if either the terms of the policy are unambiguous or there is no extrinsic evidence from which a jury could draw a factual conclusion about the parties' actual intent in adopting an ambiguous policy provision.  See Alexander & Alexander Servs., Inc., v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998).  In the latter case, where extrinsic evidence "does not shed light upon the intent of the parties," the court should "construe any ambiguities in the contract against the insurer as a matter of law."  Canada Life Assurance Co. v. Guardian Life Ins. Co. of Am., 242 F.Supp. 2d 344, 358 (S.D.N.Y. 2003); New York v. Home Indem. Co., 486 N.E. 2d 827, 829 (N.Y. 1985) ("[I]f the tendered extrinsic evidence ... will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court ... [and] the ambiguity must be resolved against the insurer which drafted the contract.").

## ANALYSIS

Notwithstanding St. Paul's characterization of this dispute as being about whether "St. Paul must *indemnify* Pierce for Pierce's contractual promise to defend Liberty," see St. Paul Mem. at 10;  St. Paul Opp'n at 3 ("This is a case about indemnity, not defense."), it is, first and foremost, a case about whether St. Paul breached its duty to defend Pierce when it declined to pay for the defense costs of Liberty in the New York action after Pierce was dismissed as a defendant.  See

---

[4] St. Paul contended in its briefs that New York law should apply to this insurance contract.  Pierce's briefs argued that there was no conflict of law between New York and the District of Columbia on this issue and that, therefore, no choice-of-law analysis was required. Subsequently, at the February 10, 2006, motions hearing, Pierce agreed that the Court should apply New York law in interpreting the contract.

Compl. at ¶ 55.  St. Paul's liability in this matter, therefore, is determined by the scope of its duty

to defend under the policy rather than by the scope of its duty to indemnify.

## I.      Overview of Duty to Defend

The duty to defend is purely contractual, meaning that the parties to the insurance policy

are free to delineate its scope in whatever manner they see fit.  See George Muhlstock & Co. v.

Am. Home. Assurance Co., 502 N.Y.S. 2d 174, 178 (N.Y. App. Div. 1986) ("[T]he duty to defend

arises from the insurer's contractual obligation to the insured.").  Courts applying New York law

have developed rules to guide the interpretation of promises to defend made by insurers, including

a presumption that "the insurer's duty to furnish a defense is broader than" its obligation to

indemnify the insured for covered expenses.  See Seaboard Surety Co. v. Gillette Co., 476 N.E. 2d

272, 275 (N.Y. 1984).  Such a presumption accords with the ordinary expectation that the insurer's

duty to defend provides the insured party with "litigation insurance" separate from -- but related to

-- the general liability coverage of an insurance policy.  See id.  By contrast, if the duty to defend

were to extend only to claims for which there was coverage (i.e., if it were coextensive with the

duty to indemnify), then the insured party would be exposed to the risk of paying defense costs

until such time as coverage is established.  Because general-liability insurance policies typically

are designed to spread such risk, courts should presume that, absent indications of a contrary

agreement, "the duty to defend is 'exceedingly broad.'"  See Park Place Entm't Corp. v.

Transcontinental Ins. Co., 225 F.Supp. 2d 406, 409 (S.D.N.Y. 2002) (quoting Continental Cas.

Co. v. Rapid-American Corp., 609 N.E. 2d 506, 509 (N.Y. 1993)).

An insurer's defense duty arises "whenever the allegations in a complaint state a cause of

action that gives rise to the reasonable possibility of recovery under the policy,"  Fitzpatrick v.

American Honda Motor Co., 575 N.E. 2d 90, 91-92 (N.Y. 1991), or in circumstances where the insurer otherwise "has actual knowledge of facts establishing a reasonable possibility of coverage," id. at 93.  Cf. Hartford Cas. Ins. Co. v. Litchfield Mutual Fire Ins. Co., 876 A.2d 1139, 1144 (Conn. 2005) (stating that, under Connecticut law, "[a]n insurer ... is not excused from its duty to defend merely because the underlying complaint does not specify the connection between the stated cause of action and the policy coverage").  "The duty to defend arises not from the probability of recovery but from its possibility, no matter how remote." George Muhlstock & Co., 502 N.Y.S. 2d at 178.  Furthermore, an insurer's duty to defend is triggered even if some of the underlying claims are outside the scope of the policy's coverage provisions, so long as at least one claim gives rise to a reasonable possibility of recovery under the policy.  See Steadfast Ins. Co. v. Stroock & Stroock & Lavan LLP, 277 F.Supp. 2d 245, 252 (S.D.N.Y. 2003) ("If *any* of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action.") (citation omitted).

II.     **The St. Paul Policy**

To determine the scope of St. Paul's contractual duty to defend Pierce, the Court must look first to the language of the policy.  The policy provides: "[St. Paul will] have the right and duty to defend any protected person against a claim or suit for injury or damage covered by this agreement."  J.A. Ex. 9 at 4.  It further provides that St. Paul will "have such right and duty even if all the allegations of the claim or suit are groundless, false, or fraudulent." Id.  Thus, St. Paul's duty to defend Pierce arises only if there is a "claim or suit" -- which, under the policy definitions, means either "a demand which seeks damages" or "a civil proceeding which seeks damages." See id.  Furthermore, the claim or suit must be "for injury or damage" -- which the policy defines to

include "property damage" -- and that injury or damage must be of a type that is covered by the policy.  See id.

Accordingly, St. Paul has a duty to defend Pierce only if the New York action was in fact a "claim or suit for injury or damage covered by [the policy]."  St. Paul apparently concluded that the New York action was such a "claim or suit" at the time Pierce was a defendant in the action because St. Paul funded (albeit under a reservation of rights) Pierce's defense for the causes of action asserted against Pierce up until the point that Pierce was dismissed on personal-jurisdiction grounds.  Following Pierce's dismissal, two things changed that, in St. Paul's view, relieved it of the duty to defend against the New York action.  First, Pierce was no longer present in the suit as a named defendant; and second, the only remaining claim in the action that related to Pierce's conduct (the claim against Liberty) was contractual in nature and therefore, according to St. Paul, any liability Pierce might face as a result of that claim would fall outside the scope of the policy's coverage.  As explained below, however, the Court concludes that Pierce's dismissal did not eliminate St. Paul's duty to defend against the claims in the New York action, and therefore St. Paul is liable to Pierce for breach of contract.

### A.    What Counts as a "Claim"?

In suggesting that its duty to defend extends only to situations in which a protected party is named defendant in an action, St. Paul urges the Court to adopt a sensible bright-line rule.  But, sensible or not, such a rule does not square with the governing language of the policy, which is at best ambiguous on this specific point.  For starters, the policy plainly is not limited to a defense of formal litigation, as the language of the duty-to-defend provision includes "claim[s]" as well as "suit[s]."  J.A. Ex. 9 at 4.  And nothing in the definition of either term -- "claim" is defined as "a

demand which seeks damages," and "suit" is defined as "a civil proceeding which seeks damages" -- specifies or even suggests that the dispute must arise in a particular procedural posture.  Quite the contrary, all that is required is that there be a claim or suit -- i.e., a demand or civil proceeding -- that "seeks damages" that possibly are within the scope of the policy's coverage.

The question then becomes: Does the use of the preposition "against" in the policy ("duty to defend any protected person *against* a claim or suit") somehow require -- even if only by implication -- that the protected person (here, Pierce) must be a *direct* target of the claim?  If that meaning was intended by the policy's drafter, it hardly was conveyed with clarity.  By way of comparison, the Court takes note of policy language referenced in another case that received significant attention in the parties' briefs, Merrick Constr. Co. v. Hartford Fire Ins. Co., 449 So. 2d 85 (La. Ct. App. 1984).  In Merrick, the policy provided that the insurer "shall have the right and duty to defend *any suit against the insured* seeking damages on account of ... bodily injury or property damage."  Id. at 88 (emphasis added).  That language clearly contemplates only representation in litigation where the insured is a party (which presumably includes defense against a direct claim, a counterclaim, a cross-claim, or a third-party claim).  See also Henkel Corp. v. Hartford Accident & Indem. Co., 399 F.Supp. 2d 607, 613 (E.D. Pa. 2005) (quoting policy language identical to that in Merrick and concluding that "the text of the policy [makes clear] that both parties intended for [the insurer] to assume a duty to defend suits brought against the insured" and therefore that the insurer had no duty to defend "any other entity when the insured is not named as a defendant" in a lawsuit).  In this case, however, the language chosen by the parties -- "duty to defend any protected person *against* a claim or suit" -- did not foreclose the possibility that St. Paul would be obliged to defend Pierce against an indirect claim (i.e., an

-10-

indirect "demand which seeks damages") arising out of potentially covered property damage.

Moreover, it assuredly does not require a strained or unnatural construction of the policy language to reach the conclusion that the insurer's duties might include the defense of an indirect claim such as the one faced by Pierce -- that is, a suit against a third party where the damages sought are closely intertwined with separate demands made directly against the insured, and where the insured would be legally obligated (by virtue of a surety relationship) to pay any resulting award. And, to the extent this policy language admits of more than one interpretation, it implicates the familiar maxim, well-established in New York law, that "ambiguities in an insurance policy must be construed against the insurer" (and in favor of the insured), as a matter of law. Lipton, Inc. v. Liberty Mut. Ins. Co., 314 N.E. 2d 37, 39 (N.Y. 1974).

This conclusion is bolstered by the rationale applied by the Court of Appeals of New York in Fitzpatrick. There, the court found that an insurer's duty to defend could be triggered even by a claim in which the "allegations do not on their face set forth a covered cause of action," if the insurer has knowledge of facts that potentially would bring a claim within the scope of the insured's coverage. Fitzpatrick, 575 N.E. 2d at 92. In that case, the insurer was aware that the defendant had acted in an insured capacity (as a corporate director and officer) when he engaged in the complained-of conduct, and therefore knew that the complaint actually stated a claim for which there was a reasonable possibility of coverage. Id. at 94. Here, the insurer, St. Paul, knew that Pierce would have been legally obligated to pay any judgment against Liberty that resulted from Pierce's conduct, and therefore that the New York action in fact involved a claim against Pierce, even if it was nominally against Liberty alone once Pierce had been dismissed on personal-jurisdiction grounds.

-11-

In short, the Court concludes that a defense of a protected person "against a claim ... for injury or damage," within the meaning of this particular policy, *may* require the insurer to pay the defense costs of a third party in limited circumstances such as those presented by the New York action.  Specifically, that context is a lawsuit against a third party where (1) the insured had been a defendant but was dismissed from the case without an adjudication on the merits, (2) the third party is present in the action solely by virtue of its role as the insured's surety, (3) resolution of the claims against the third party would require resolution of allegations about the insured's conduct, (4) the insured would be legally bound to indemnify the third party for any payment in satisfaction of a judgment, (5) the plaintiff in the suit has made closely related demands directly against the insured through a separate action, and (6) the insurer was fully aware of these circumstances.[5] This conclusion, however, is not dispositive of the question whether St. Paul had a duty to defend Pierce in the New York action, because the existence of a claim against a protected person is merely a necessary, but not a sufficient, condition for the duty to arise.  The claim also must be for damages that, if awarded, would be within the scope of the policy's coverage.

**B.      Does the Claim Create a "Reasonable Possibility" of Coverage?**

St. Paul contends that, even if the New York action against Liberty can be construed as a

---

[5] The Court does not agree with St. Paul's contention that requiring it to provide a defense against an "indirect" claim such as this will somehow render superfluous those provisions of the policy that identify "protected persons" and "additional protected persons."  See St. Paul Opp'n at 5-6.  To the contrary, those provisions are essential to determining whether there is a reasonable possibility of coverage.  Because coverage is limited to "amounts any *protected person* is legally required to pay," see J.A. Ex. 3 at 1 (emphasis added), there cannot be a reasonable possibility of coverage unless one of the identified insureds ("protected persons") might be required to make a payment that meets the other criteria for coverage.  If a protected person would make such a payment upon resolution of a claim or suit in favor of the claimant or plaintiff, then there is a reasonable possibility of coverage, and St. Paul -- *under the terms of this policy* -- would have a duty to defend against that claim or suit.

claim against Pierce, within the policy language, it is not a claim for "injury or damage covered by this agreement," as also required by the policy.  J.A. Ex. 9 at 4.  The Court interprets the "covered by this agreement" limitation on the duty to defend as precluding only those claims that do not create a "reasonable possibility" of coverage, because there is no suggestion in the record that the parties intended St. Paul's duty to defend to be coextensive with its duty to indemnify.  Moreover, there is language in the policy -- specifically, the statement that St. Paul's duty to defend exists "even if all the allegations of the claim or suit are groundless, false, or fraudulent," id. -- that is consistent with the common-law presumption that the defense duty is broader than the indemnity duty.  See Fitzpatrick, 575 N.E. 2d at 92.  Hence, the Court now must determine whether there was, as Pierce contends, a "reasonable possibility" (at the time the New York action was ongoing) that Pierce would be covered under the policy if the suit against Liberty (i.e., the indirect claim against Pierce) succeeded, or whether, instead, there was, as St. Paul argues, no possible factual or legal basis on which St. Paul might have been obligated to indemnify Pierce under the policy.  That determination turns on the nature of the claim regarding Pierce's conduct as well as the language of the policy's coverage provisions and exclusions.

    1.    The claim

    Pierce contends that Count XI of the complaint in the New York action, which was styled as a "breach of contract" claim against Liberty, created a reasonable possibility of policy coverage even after Pierce's dismissal as a defendant in the action.  Count XI asserted that Pierce failed "to perform [its] work on the Project in a good, workmanlike and timely manner, and in accordance with contract documents" and that, because of that failure, 2200 M was forced to spend a substantial amount of money on, among other things, "investigating water intrusion and mold

damage at the Project," resolving claims by residential unit owners of resulting damage to their

property and furnishings, and "performing necessary repairs to mitigate damages."  See J.A. Ex. 8

at 39.  The complaint in the New York action alleged that Liberty, as the surety of Pierce's

performance bond, was responsible for these and other damages sustained by 2200 M, and that

Liberty had breached its surety obligation by denying its liability.  See id.

     2.  Policy coverage language

  The relevant coverage provision of the policy provides: "[St. Paul will] pay amounts any

protected person is legally required to pay as damages for covered[6] bodily injury or property

damage that: happens while this agreement is in effect; and is caused by an event."  J.A. Ex. 9 at

2-3.  An "event" is defined as "an accident, including continuous repeated exposure to

substantially the same general harmful conditions," id. at 2, and "property damage" is defined as

"physical damage to tangible property of others, including all resulting loss of use of that property;

or loss of use of tangible property of others that isn't physically damaged," id.

  Thus, as applied to the facts of this case, there would be coverage under the policy if (1)

Pierce were legally required to make a payment (2) as "damages" for bodily injury or property

damage, which (3) was caused by an event (an "accident") and (4) occurred at a time when the

policy was in effect.  If the claim against Liberty in the New York action created a reasonable

possibility that all four of these conditions were met, and if no policy exclusion applied, then St.

Paul would have a duty to defend Pierce by providing a defense for Liberty.

---

  [6] The use of the modifier "covered" within this provision is, as far as the Court can decipher, a mere tautology.

     *a.*      *Would the claim result in a "legally required" payment by Pierce?*

It is beyond dispute that Pierce would be legally required to reimburse Liberty for any amount Liberty paid as a result of Pierce's conduct, not only by virtue of its express agreement of indemnity, see J.A. Ex. 3, but also based on the common law of suretyship, see Badolato v. Molinari, 174 N.Y.S. 512, 512 (N.Y. Sup. Ct. 1919) ("The general rule is ... that a surety may hold his principal on an implied agreement to indemnify, even where there is no express promise."). The claim against Liberty in the New York action, therefore, created a reasonable possibility that Pierce would be legally required to pay some amount of money.

     *b.*      *Would that payment constitute "damages for ... property damage"?*

As for whether such a payment by Pierce to Liberty would amount to a payment of "damages for ... property damage,"[7] there is no doubt that the claim against Liberty relates to property damage, and the Court further concludes that a payment made by Pierce in satisfaction of a judgment against Liberty in the New York action would fairly fit within the meaning of "damages" -- a term that the policy nowhere defines.[8]  Looking at other uses of the term within the policy, it is clear that "damages" are amounts sought in a claim or suit.  See J.A. Ex. 9 at 4 (defining "claim" and "suit").  So, to the extent the New York action against Liberty constitutes a "claim or suit" against Pierce -- which the Court has already determined it does -- any amount recovered as a result of that cause of action would be "damages," within the meaning of the

---

     [7] There is no indication that any of the claims related to Pierce's work on the Millennium Square construction project involved bodily injury.

     [8] In the context of the policy, the term "damages" is distinct from the phrase "injury or damage," which the policy *does* define and which refers to various types of harm for which an insured might be required to pay "damages."  See J.A. Ex. 9 at 4.

policy.  And the Court sees no reason to make a distinction based on the possibility that Liberty would have made an initial payment on the judgment and Pierce would subsequently have reimbursed Liberty for that amount, because it is equally conceivable that Pierce would have directly paid any judgment against Liberty based on its indemnification duty.  The claim against Liberty in the New York action, therefore, created a reasonable possibility that Pierce would be legally required to pay some amount of money as damages for property damage.

*c.*        *Was the property damage possibly caused by an "event"?*

The policy provides that coverage exists only if the property damage is the result of an "event," which it further defines as an "accident."  <u>See</u> J.A. Ex. 9 at 2-3.  St. Paul vigorously argues in its briefs that this case does not involve an "accident," but the focus of that argument seems misplaced.  St. Paul is surely correct that the amounts paid by Pierce to Liberty for Liberty's *defense* are not themselves damages paid for property damage caused by an accident, <u>see</u> St. Paul Mem. at 10-12, but that fact has no bearing on the outcome of this case because Pierce is not seeking indemnification under the coverage provisions of the policy for those third-party defense costs.  Instead, Pierce is seeking damages (namely the costs of defending Liberty) resulting from an alleged breach by St. Paul of its contractual duty to defend against the claim in the New York action.  What matters is whether the property damage that is the subject of the New York action was caused by an accident, and no one has argued that the relevant property damage to tenants and others that occurred at the Millennium Square project was caused by anything other than mere negligence or unintentional product failure.  The claim against Liberty in the New York action, therefore, created a reasonable possibility that Pierce would be legally required to pay some amount of money as damages for property damage caused by an event.

-16-

d.      *Did the property damage occur while the policy was in effect?*

The timing of the alleged property damage is not disputed by the parties, and St. Paul concedes that the policy was in effect at all relevant times.  The claim against Liberty in the New York action, therefore, created a reasonable possibility that Pierce would be legally required to pay some amount of money as damages for property damage caused by an event that occurred while the policy was in effect.  In other words, the New York action against Liberty created a reasonable possibility of recovery under the policy's primary coverage provision and therefore gives rise to a presumption that St. Paul had a duty to defend against the claim.

e.      *Would any policy exclusions preclude coverage?*

As a final matter, however, St. Paul asserts that it can overcome any presumption that it has a duty to defend based on the exclusionary provisions of the policy.  Under New York law, for an insurer "to be relieved of its duty to defend on the basis of a policy exclusion[,] the insurer bears the 'heavy burden' of demonstrating that 'the allegations of the complaint cast the pleadings wholly within the exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision.'"  Park Place Entm't, 225 F.Supp. 2d at 410-11.  The Court concludes that St. Paul cannot meet this burden under the relevant policy language, law, and circumstances of this case.

Although the policy excludes from coverage "injury or damage for which [Pierce] has assumed liability under any contract or agreement," J.A. Ex. 9 at 12, it expressly disclaims application of this exclusion in situations where Pierce "would have liability [for the injury or damage] without the contract or agreement," id.  In other words, the policy does *not* cover

property damage[9] for which Pierce assumed liability under a contract *unless* Pierce would have been liable for that property damage even without the contract (i.e., based on a tort theory).

St. Paul argues that, because Pierce had a contractual relationship with the plaintiff in the New York action (2200 M), any liability for property damage that might arise out of the New York action against Liberty would be a *purely* contractual liability and thus outside this exception to the contract exclusion provision.  See Structural Bldg. Products Corp. v. Business Ins. Agency, Inc., 722 N.Y.S. 2d 559, 562 (N.Y. App. Div. 2001) ("The general rule is that a commercial general liability insurance policy does not afford coverage for breach of contract, but rather for bodily injury and property damage.").  The Court, therefore, must consider the nature of the damages sought in Count XI of the New York action and then determine whether there was any possible factual or legal basis upon which Pierce might have been liable for that alleged property damage absent its contracts (thereby rendering the exclusion inapplicable).

New York law generally treats all damages sustained by a contracting party due to the fault of another contracting party to be in the nature of contractual damages.  See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E. 2d 190, 194 (N.Y. 1987) (upholding dismissal of a negligence cause of action brought by a contractor against its client because plaintiff did not allege "violation of a legal duty independent of the contract" and "the damages plaintiff allegedly sustained as a consequence of defendant's [failure to exercise due care in performing contract duties] were clearly within the contemplation of the written agreement"); but see Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 725 F.Supp. 656, 661 (N.D.N.Y. 1989) ("The courts in

---

[9] The policy defines "injury or damage" to mean "bodily injury, personal injury, or advertising injury; *or property damage*."  J.A. Ex. 9 at 4 (emphasis added).

New York have long held that a contractual party *may, under certain circumstances,* be held liable in tort should the defective performance of contractual services by one contractual party injure the person or property of the other contractual party." (emphasis in original)).  And Pierce acknowledges that Count XI seeks some economic damages from Pierce, through Liberty, that are unquestionably beyond the scope of damages for which the policy provides coverage because they are purely the result of contractual liability (for example, the cost of replacing pipes and other plumbing fixtures installed by Pierce).

But Count XI also seeks damages that, although they arise out of Pierce's work under the contract, are consequential damages to third parties -- such as the costs of repairing damage to the property and furnishings of residential unit owners, see J.A. Ex. 8 at 39 -- for which Pierce very well might have independent tort liability.  Indeed, many of the asserted damages in Count XI overlap substantially with the damages asserted in Count II, the negligence claim against Pierce that was dismissed on personal-jurisdiction grounds, see J.A. Ex. 8 at 25 (seeking "costs and expenses [incurred] in the ... remediation of damage to certain areas of the Project, including but not limited to certain common areas, residential units, areas of the Ritz-Carlton Hotel, and to other property located in certain common areas and residential units").  Such third-party property damage certainly is a type of damage for which Pierce "would have liability without the contract or agreement," and thus is in a category of contractually assumed liability that is exempt from the policy's contract exclusion provision.  See J.A. Ex. 9 at 12.

The contract exclusion provision clearly contemplates that there may be overlap between tort liability and contract liability -- and accordingly provides that where tort liability would exist independent of contract liability the exclusion is inapplicable, see J.A. Ex. 9 at 12.  Therefore, the

Court is unable to say that "'the allegations of the complaint cast the pleadings wholly within the exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision.'" See Park Place Entm't, 225 F.Supp. 2d at 410-11.  Hence, St. Paul cannot be relieved of its duty to defend on the basis of the contract exclusion.[10]

The circumstances of this case are distinguishable from those in George A. Fuller Co. v. United States Fid. & Guar. Co., 613 N.Y.S. 2d 152 (N.Y. App. Div. 1994), where the court held that the insurer had no duty to defend against a complaint that could not "be read to assert a claim other than one by a contracting party for the economic loss it sustained due to the allegedly defective work by the other contracting party."  Id. at 155.  Here, the New York action can be read to assert a claim beyond 2200 M's economic losses -- namely a claim of property damage to third parties -- whereas in Fuller, the "only damages claimed were those inherent in the defective work."  Id.; cf. Auto-Owners Ins. Co. v. Toole, 947 F.Supp. 1557, 1564 (M.D. Ala. 1996) ("[T]his court declines to adopt any broad holding that claims sounding in contract are not occurrences [for purposes of a liability insurance policy].  Rather, ... the court [will] look to the specific 'kind of ... claim' being asserted, regardless of whether it is labeled a contract claim, a tort claim, or whatever, and the 'purpose of the general liability policy' from which coverage is sought.") (quoting City of Burlington v. Nat'l Union Fire Ins. Co., 655 A.2d 719, 722 (Vt. 1994)).

---

[10] Because the Court concludes that some of the property damage for which damages are sought in the New York action is property damage for which Pierce would have liability independent of its contractual arrangements, and therefore that the tort-liability exception to the contract exclusion applies, the Court need not decide whether the "covered contract" exception to the exclusion also would apply.

Although St. Paul asserts that granting Pierce's motion for partial summary judgment will lead to a requirement that insurers with similarly worded policies "pay for *anyone's* defense costs *in any case* where the outcome may have a potential adverse effect on the insured," see St. Paul Reply at 2 (emphasis in original), this Court's holding in this case is not nearly so far-reaching. Indeed, nothing in this opinion suggests that an insurer must "fund litigation any time that [the insured] believes that it may be in [its] interests for the [insurer] to do so," id. at 3, or that any claim or suit that "may have a potential adverse effect on the insured" implicates the policy's duty-to-defend provision.  Instead, what the Court holds is only that the language of *this* policy, under the circumstances present in this case, requires the insurer to shoulder the cost of defending claims that create a reasonable possibility of coverage, even if the claims are asserted only indirectly against the insured, such as through a suit against a third-party surety.  The cure for the broad impact St. Paul fears lies in the revision of its policy language, not in over-extending the limited holding in this case.

## CONCLUSION

For the foregoing reasons, and based upon the entire record herein, the Court finds that St. Paul breached its duty to defend Pierce and, accordingly, will grant Pierce's motion for partial summary judgment on the issue of liability.  A separate order has been issued herewith.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:   March 13, 2006

Copies to:

Barry Jay Fleishman
Kristi Singleton
DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, L.L.P.
2101 L Street, NW
Washington, DC  20037-1526
Email: singletonk@dsmo.com

*Counsel for plaintiff Pierce Associates, Inc.*


Walter Joseph Andrews
Ruth S. Kochenderfer
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, VA 22102
Email: wandrews@hunton.com

*Counsel for defendant St. Paul Mercury Insurance Co.*